UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TOPIA TECHNOLOGY, INC., | Case No.  23-cv-00063-JSC |
| Plaintiff, | |
| v. | **CLAIM CONSTRUCTION ORDER** |
| BOX, INC., | Re: Dkt. Nos. 174, 177, 178, 180 |
| Defendant. | |

Topia Technology, Inc. sues Box, Inc. for patent infringement of U.S. Patent No. 10,289,607 ("the '607 patent"), U.S. Patent No. 10,642,787 ("the '787 patent"), U.S. Patent No. 10,754,823 ("the '823 patent"), and U.S. Patent No. 11,003,622 ("the '622 patent"). (Dkt. No. 48.)[1] Topia's complaint also asserted infringement as to U.S. Patent No. 9,143,561 ("the '561 patent") and U.S. Patent No. 10,067,942 ("the '942 patent"), but those claims have since been invalidated. (*Id.*; Dkt. No. 138 at 2.) Topia accuses Box's products, including Box Sync and Box Drive, of infringing all asserted patents. (Dkt. No. 48 at ¶¶ 27, 79, 119, 158, 199, 239.)

Before the Court is the parties' claim construction dispute regarding the following four terms:

**1.** "responsive to the user modifying a content"
**2.** "automatically transfer" / "automatically transferring"
**3.** "graphical availability indication is presented <u>proximate</u> a file icon" / "graphical availability indication is presented <u>proximate</u> a graphical file representation of the first file" / "availability indication is presented <u>proximate</u> a graphical file representation" (underlining added)
**4.** "priority assignment configuration"

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

United States District Court
Northern District of California

(Dkt. No. 169 at 2.)  Having carefully considered the parties' briefing and evidence, including supplemental briefing, and with the benefit of a September 12, 2025 *Markman* hearing, the Court construes the terms as set forth below.

# BACKGROUND

## I.    Overview of the Asserted Patents

The '607 and '622 patents are both titled "Architecture for Management of Digital Files Across Distributed Network."  '607 patent, (54) (Dkt. No. 49-3); '622 patent, (54) (Dkt. No. 49-6). The '787 and '823 patents are titled "Pre-File-Transfer Update Based on Prioritized Metadata" and "Pre-File Transfer Availability Indication Based on Prioritized Metadata," respectively.  '787 patent, (54) (Dkt. No. 49-4); '823 patent, (54) (Dkt. No. 49-5).  All four asserted patents "relate[] generally to computer-implemented processes and, more specifically, to sharing of electronic files among computer systems."  '607 patent, Field of the Invention; '622 patent (same); '787 patent (same); '823 patent (same).

The '607 and '622 patents' abstracts describe the automatic transfer of files from one device to another responsive to a user modifying the file:

> In certain embodiments, automatic modification-triggered transfer of a file among two or more computer systems associated with a user. In some embodiments, a copy of a first file may be received, via a first application at a first computer system, from a second application at a second computer system associated with a user.  The first file copy may be automatically received from the second application responsive to the user modifying a content of the first file, where the first file copy is a version of the first file that is generated from the user modifying the content of the first file.  Responsive to receiving the first file copy from the second computer system, the first file copy may be automatically transferred via the first application to a third computer system associated with the user to replace an older version of the first file stored on the third computer system.

'607 patent, (57); '622 patent, (57).  In addition to the automatic file transfer discussed above, the '787 and '823 patents' abstracts further elaborate on a method for notifying the user of an updated file version based on transfer of the file's metadata prior to transfer of the document itself:

> After receiving metadata associated with the updated version of the file from the first client device, the server system may automatically

> transfer the metadata to a second client device associated with the user such that, before the file copy is transferred to the second client device, the transfer of the metadata to the second client device causes a graphical availability indication of the updated version of the file to be presented (e.g., proximate a file icon representing the file) at the second client device based on the metadata.

'823 patent, (57); '787 patent, (57) (substantially the same content).

In essence, the patents aim to enable file management and synchronization across multiple devices without requiring users to manually move files between devices. To accomplish this, all patents claim a server system that automatically synchronizes files between devices responsive to a user modifying the files. '607 patent, 10:58-11:25; '622 patent, 10:60-11:24; '787 patent, 11:9-55; '823 patent, 11:11-61. When a user modifies a file on a first device, the server automatically receives the file and the metadata associated with the file. *See, e.g.,* '607 patent, 10:61-67. The server then automatically transfers the file metadata, followed by the file itself, to the second device where it replaces the old file version. *Id.* at 11:13-18. Because the synchronization process is lengthy, prioritizing transfer of the metadata allows the second device to reflect the existence of an updated file, via the transferred metadata, prior to the completed download of the updated file.

The '787 and '823 patents further claim a graphical availability indication that appears proximate to the updated file's file icon once the file's metadata has transferred. '787 patent, 11:33-55; '823 patent, 11:35-61. This graphical availability indication signals that an updated version of the file is available for download. '787 patent, 11:33-55; '823 patent, 11:35-61. All asserted patents are in the same family and share an identical specification.

## II.   Procedural History

### A.   Transfer

In December 2021, Topia sued Box in the Western District of Texas. (Dkt. No. 1.) In July 2022, Box moved to transfer the case to the Northern District of California. (Dkt. No. 44.) While the motion to transfer was pending, the parties completed claim construction briefing, but the motion to transfer was granted prior to holding a *Markman* hearing. (Dkt. Nos. 44, 47, 52, 54, 59, 74, 75.)

### B.  Inter Partes Review

Box filed *inter partes review* (IPR) petitions against all asserted patents.[2]  The PTAB

instituted IPR as to the asserted claims of two of the asserted patents, the '651 and '942 patents,

and found the asserted claims to be unpatentable.  (Dkt. No. 133 at 2; Dkt. No. 138 at 2.)  Topia is

currently appealing those decisions to the Federal Circuit.  (Dkt. No. 139 at 2.)  Institution on the

other four patents was denied.  (Dkt. No. 133 at 2.)

### C.  Delaware Litigation

Separately, in the District of Delaware, Topia sued Egnyte, Inc. for infringement of the

same patents at issue here.  *See Topia Tech., Inc. v. Egnyte, Inc.*, No. 21-CV-01821 CJB (D. Del.

filed Dec. 27, 2021).  Notably, the judge in the Delaware proceeding construed "responsive to the

user modifying a content"—a disputed term here, too.  (Dkt. No. 178-2 at 11-17; Dkt. No. 174-5 at

2.)  Relying on its construction of this term, the Delaware court granted Egnyte's motion for

summary judgment of non-infringement.  (Dkt. No. 178-2 at 19.)  Topia has since filed a motion

for reargument on this construction that is still pending.  (Dkt. No. 182-1.)

## LEGAL STANDARD

Box's motion proposes constructions for two terms (Terms 1 and 2) and alleges

indefiniteness for the other two (Terms 3 and 4).

### I.  Claim Construction Generally

"It is a bedrock principle of patent law that the claims of a patent define the invention to

which the patentee is entitled the right to exclude."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312

(Fed. Cir. 2005) (cleaned up).  Claim terms are defined by their "ordinary and customary

meaning," which is "the meaning that the term would have to a person of ordinary skill in the art

in question at the time of the invention."  *Id.* at 1312-13.  In ascertaining the ordinary meaning of a

---

[2] *See Box, Inc. v. Topia Tech., Inc.*, IPR No. 2023-00433, Dkt. No. 3 (P.T.A.B. Jan. 4, 2023); *Box, Inc. v. Topia Tech., Inc.*, IPR No. 2023-00432, Dkt. No. 3 (P.T.A.B. Jan. 4, 2023); *Box, Inc. v. Topia Tech., Inc.*, IPR No. 2023-00431, Dkt. No. 3 (P.T.A.B. Jan. 4, 2023); *Box, Inc. v. Topia Tech., Inc.*, IPR No. 2023-00430, Dkt. No. 3 (P.T.A.B. Jan. 5, 2023); *Box, Inc. v. Topia Tech., Inc.*, IPR No. 2023-00429, Dkt. No. 3 (P.T.A.B. Jan. 5, 2023); *Box, Inc. v. Topia Tech., Inc.*, IPR No. 2023-00427, Dkt. No. 3 (P.T.A.B. Jan. 4, 2023).

United States District Court
Northern District of California

term, courts first look to the patent's claim terms, specification, and prosecution history, which is the patent's "intrinsic record." *Id.* at 1313. The claim language is "of primary importance" when determining the bounds of the claimed invention, and "[t]he specification necessarily informs the proper construction of the claims." *Id.* at 1313, 1316. Extrinsic evidence may elucidate relevant art, but such evidence is only considered within the context of intrinsic evidence. *Id.* at 1317-19. "Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995).

## II.    Indefiniteness

A patent is presumed valid. 35 U.S.C. § 282. "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). The party challenging a patent's validity has the burden of proving indefiniteness by clear and convincing evidence. *Dow Chem. Co. v. Nova Chems. Corp. (Can.)*, 809 F.3d 1223, 1227 (Fed. Cir. 2015); *see also Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 95 (2011) (holding a party asserting a section 282 invalidity defense must prove it by clear and convincing evidence).

35 U.S.C. § 112 requires claims to particularly point out and distinctly claim the subject matter regarded as the invention. *Nautilus*, 572 U.S. at 902. Though "absolute precision is unattainable[,]" "a patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them." *Id.* at 909-10 (cleaned up). "Claim language employing terms of degree has long been found definite where it provided enough certainty to one of skill in the art when read in the context of the invention." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014). A claim is sufficiently definite if it provides objective boundaries for those of skill in the art. *Id.* at 1371.

"[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012). General principles of claim

United States District Court
Northern District of California

construction apply when evaluating indefiniteness. *HZNP Medicines LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680, 688 (Fed. Cir. 2019).

## DISCUSSION

### I.    Term 1

| Claim Term | Box's Proposed Construction | Topia's Proposed Construction |
|---|---|---|
| Receiving a file "responsive to the user modifying a content" of the file ('607, '787, '823, and '622 patents) | responsive to the user modifying a content, as opposed to being performed on a periodic or other timing basis | No further construction is necessary. This term should be given its plain and ordinary meaning, e.g., referring to a condition of the user modifying a content of the first file stored on the first client device as an initial triggering event for a corresponding recited action.<br><br>In the context of the present claims, the plain and ordinary meaning of "modifying a content of the first file stored on the first client device" is saving the file to persistent storage on the first client device. |

The claim phrase "responsive to the user modifying a content" appears in every independent claim of the '607, '787, '823, and '622 patents. The claim phrase appears in the asserted claims as follows:

> 1.  A system comprising:
>
> a server system comprising one or more processors programmed with computer program instructions that, when executed, cause the server system to:
>
> receive, over a network, a copy of a first file from a first client device associated with a user, wherein the copy of the first file is automatically received from the first client device **responsive to the user modifying a content** of the first file stored on the first client device, the copy of the first file being a version of the first file that is generated from the user modifying the content of the first file; receive, from the first client device, first metadata associated with the version of the first file that is generated from the user modifying the content of the first file, the first metadata

6

being assigned a first priority greater than a second priority assigned to the copy of the first file; …

*See, e.g.,* '607 patent, 10:58-11:8 (emphasis added).

The parties dispute the meaning of "responsive to the user modifying a content."  During briefing, it became apparent the parties also disagreed as to the meaning of "modifying a content" within the broader phrase.  The Court first addresses the meaning of "responsive to the user modifying a content."  Then, the Court addresses the meaning of "modifying a content."

**A.  "responsive to the user modifying a content"**

To begin, the parties agree the "user modifying a content" is the "triggering event" that begins the automatic file upload and, following this triggering event, there may be intervening events to completely transfer the file.  (*See* Dkt. No. 177 at 6-7; Dkt. No. 178 at 10-11.)  The crux of the dispute is whether this triggering event—"the user modifying a content"— can be interpreted to include transfer triggered on "a periodic or other timing basis."  It cannot.

> **1.  The plain and ordinary meaning of "responsive to the user modifying a content" excludes a timing based or periodic initiation of the synchronization process.**

A court may properly determine a claim term need not be construed because the term has a plain meaning from the intrinsic record.  *Phillips*, 415 F.3d at 1312-13.  Claim 1 teaches the first file is automatically received from the first client device "responsive to the user modifying a content."  '607 patent, 10:62-67.  Given "the user modifying a content" is the initial triggering event, file upload cannot be initiated on a periodic or other timing basis.  If the file upload could be triggered on a periodic or other timing basis, then the upload would *not* be "responsive to the user modifying a content."  It would be responsive to a predetermined amount of time.  Thus, the plain and ordinary meaning of "responsive to the user modifying a content" excludes a timing based or periodic initiation of the synchronization process.

> **2.  The prosecution history is consistent with the plain and ordinary meaning of the phrase.**

Prosecution history can provide guidance as to the meaning of claim language by "demonstrating how the inventor understood the invention."  *Phillips*, 415 F.3d at 1317.  Topia's

statements during prosecution of its patents demonstrate it understood "responsive to the user modifying a content" to exclude timing based or periodic triggering events.

During the prosecution of the '607 patent, the patent examiner rejected claims, including the disputed phrase "responsive to the user modifying a content," as being anticipated by U.S. Patent Application Publication No. 2007/0180084 to Mohanty ("Mohanty"). (Dkt. No. 174-2 at 13.) To overcome this rejection, Topia distinguished its invention from Mohanty on several grounds. (*Id.* at 13-14.) Relevant here, Topia asserted:

> Mohanty merely describes timing-based backups (e.g., periodic or other timing bases), **where a timer triggers the transfer of changed files** from a client device to a wireless device or from the wireless device to a network device. That is, the automated file backup process in Mohanty is merely **performed on a periodic or other timing basis, as opposed to being responsive to a user modifying a content of a file stored on the client device**. The claimed invention, however, involves the device/system (which performs the automatic transfer to the second client device) automatically receiving the copy of the file from the first client device responsive to the user modifying a content of the first file stored on the first client device.

(*Id.* at 14 (emphasis added) (citations omitted).) Topia made the same distinction to overcome a rejection in light of Mohanty when prosecuting the '622 patent, too. (Dkt. No. 174-3 at 10.)

In distinguishing the claimed invention from Mohanty, Topia distinguished file transfer "responsive to the user modifying a content" from a timing-based file transfer. (Dkt. No. 174-2 at 14.) Specifically, in Mohanty "a timer *triggers* the transfer of changed files" resulting in a backup process performed on a periodic or other timing basis, as opposed to "the user modifying a content." (*Id.* (emphasis added).) By distinguishing between these triggers during the prosecution history, Topia demonstrated its understanding of the disputed phrase— "*responsive to the user modifying a content*"—as meaning the "user modifying a content," not a timer, is the triggering event that begins the synchronization process.

### 3. The Delaware court's claim construction of "responsive to a user modifying a content" is consistent with this construction.

The Delaware court determined "responsive to a user modifying a content" means "referring to a condition of the user modifying a content as an initial triggering event for a

8

corresponding recited action." (Dkt. No. 174-5 at 2.) There, the dispute revolved around whether there could be additional intervening events to complete the file transfer process. (*Id.*) The court concluded Topia's statements to the Patent Office, the same statements relevant here, could have been distinguishing the prior art reference "on the basis that its invention instead kicks off that transfer process 'responsive to the user modifying a content' (and was not suggesting that this is the only event that might ever be a part of the transfer process)." (*Id.*) Topia and Box agree. The Delaware court did not address whether the term can include a periodic or other timing-based initiation of the synchronization process. As discussed above, this Court determines it cannot.

***

For these reasons, the Court construes "responsive to the user modifying a content" to mean "the user modifying a content, not a timing based or periodic trigger, initiates the synchronization process." The Court's construction of this phrase is only directed to the initiation, not subsequent intervening events to completely transfer the file.

### B. "modifying a content"

During claim construction briefing the parties introduced a new claim construction issue: the interpretation of "modifying a content." Neither party identified "modifying a content" in the joint claim construction statement as a term needing construction. Indeed, Topia asserted no construction was necessary beyond the plain and ordinary meaning. Even so, Topia gave its own spin on the words in the context of this case—interpreting "modifying a content" as "saving the file to persistent storage on the first client device." (Dkt. No. 169-1 at 1.) Box did not provide an alternative meaning for "modifying a content" in the joint claim construction statement, but it disputed Topia's proposed meaning of "modifying" in both its opening and reply briefing. (Dkt. No. 169-2 at 1; Dkt. No. 174 at 14 n.7; Dkt. No. 178 at 11-12.) The Delaware court determined "modifying a content" means "editing content of the file, which does not involve saving the file." (Dkt. No. 178-2 at 18.)

#### 1. Box has not waived its argument.

First, Topia insists Box waived its "modifying a content" proposed construction by not raising the issue in the joint claim construction statement. The Court in its discretion declines to

United States District Court
Northern District of California

United States District Court
Northern District of California

1    find waiver.  Topia first raised the waiver argument in its sur-reply brief, (Dkt. No 180 at 6-7), so

2    Box did not have an opportunity to respond in writing.  In any event, the briefing reveals an actual

3    dispute regarding the meaning of "modifying a content."  "When the parties raise an actual dispute

4    regarding the proper scope of the[] claims, the court, not the jury, must resolve that dispute."  *O2*

5    *Micro*, 521 F.3d at 1360; *see also Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d

6    1314, 1319 (Fed. Cir. 2016) ("By determining only that the terms should be given their plain and

7    ordinary meaning, the court left this question of claim scope unanswered, leaving it for the jury to

8    decide.  This was legal error.").

9          Topia's reliance on *Dali Wireless, Inc. v. Corning Optical Communications LLC*, No. 20-

10   cv-06469-EMC, 2021 U.S. Dist. LEXIS 134185, at *53 (N.D. Cal. July 19, 2021) to support its

11   waiver argument is unpersuasive.  There, the district court determined a party's failure to raise an

12   argument as to whether the claim preamble was limiting in the joint claim construction statement

13   had waived this argument.  *Id.* at *53-54.  The court nevertheless went on to assess the merits of

14   the argument, determining that the preamble was not limiting even if the argument were not

15   waived.  *Id.* at *54.  And the Federal Circuit "defers to the district court when interpreting and

16   enforcing local rules so as not to frustrate local attempts to manage patent cases according to

17   prescribed guidelines."  *Genentech, Inc. v. Amgen, Inc.*, 289 F.3d 761, 774 (Fed. Cir. 2002).  This

18   deference includes giving the district court "considerable latitude in determining when to resolve

19   issues of claim construction."  *Cytologix Corp. v. Ventana Med. Sys.*, 424 F.3d 1168, 1172 (Fed.

20   Cir. 2005).  Here, while Box did not expressly dispute the meaning of "modifying a content" in

21   the joint claim construction statement, Topia inserted its proposed meaning under the guise of

22   plain and ordinary meaning rather than explicitly identifying the term for construction.

23   Regardless, the claim construction process is still ongoing, and the purpose of this process is to

24   "determin[e] the meaning and scope of the patent claims asserted to be infringed."  *Markman*, 52

25   F.3d at 976.  The meaning of "modifying a content" impacts the scope of the asserted claims.  So,

26   the Court, in its discretion, will resolve this dispute.

27

28

**2.    Topia is not collaterally estopped from raising a new claim construction.**

Next, Box argues "collateral estoppel prohibits Topia in this case from challenging the Delaware court's construction of 'modifying a content.'"  (Dkt. No. 178 at 13.)  Because issue preclusion is not an issue unique to patent law, the law of the circuit in which the district court sits applies.  *Phil-Insul Corp. v. Airlite Plastics Co.*, 854 F.3d 1344, 1353 (Fed. Cir. 2017).  Under Ninth Circuit law, collateral estoppel applies if: "(1) the issue necessarily decided in the previous proceeding is identical to the one which is sought to be relitigated; (2) the first proceeding ended with a final judgment on the merits; and (3) the party against which collateral estoppel is asserted was a party or in privity with a party at the first proceeding."  *Hydranautics v. FilmTec Corp.,* 204 F.3d 880, 885 (9th Cir. 2000).  Two of the factors are not in dispute, namely the issue decided in the prior proceeding was identical and Topia was a party to the prior litigation.  The parties dispute the finality of the judgment on the merits.

Because the Delaware court's judgment is not final, collateral estoppel does not apply.  To be "final" for collateral estoppel purposes, the prior adjudication of an issue in another action must be "sufficiently firm."  *See Luben Indus., Inc. v. United States,* 707 F.2d 1037, 1040 (9th Cir. 1983).  Among the factors relevant to the determination of "firmness" is "that the decision was subject to appeal or was in fact reviewed on appeal."  *Id.* (citing Restatement (Second) of Judgments § 13 (1982)).  Here, Topia filed a motion for reargument, which is still pending.  (*See* Dkt. No. 182.)  In response to Topia's motion, the Delaware court vacated the deadline "by which the parties needed to file a proposed form of final judgment."  (Case No. 21-cv-01821, Dkt. No. 463.)  As there has been no final judgment in the Delaware case, there is no judgment yet to appeal.  On this ground, the cases Box cites where the Federal Circuit affirmed the verdict or a motion for reconsideration was denied are distinguishable.  *See BSD Crown, Ltd. v. Amazon.com, Inc.*, No. 3:23-CV-00057-WHO, 2024 WL 1120979, at *5-6 (N.D. Cal. Mar. 14, 2024) (determining that judgment was final after the Federal Circuit affirmed the verdict and the denial of the party's motion on appeal); *Droplets, Inc. v. Yahoo! Inc.*, No. 12-CV-03733-JST, 2019 WL 5781915, at *2-3 (N.D. Cal. Oct. 15, 2019) (stating that finality was uncontested where the party's motion for reconsideration in the prior proceeding was denied).  Thus, the Delaware court's

1    judgment is not "sufficiently firm" to be given preclusive effect.  *Luben Indus.,* 707 F.2d at 1040.

2        **3.  The plain and ordinary meaning of "modifying a content" is instructive.**

3        "In some cases, the ordinary meaning of claim language as understood by a person of skill

4    in the art may be readily apparent even to lay judges, and claim construction in such cases

5    involves little more than the application of the widely accepted meaning of commonly understood

6    words." *Phillips*, 415 F.3d at 1314.  The ordinary meaning of "modifying a content" is readily

7    understood by the Court to be "editing the content," not "saving the file to persistent storage on

8    the first client device."  For instance, if a user were to sit at their computer and make changes to a

9    word document for 20 minutes but then failed to save the changes prior to exiting the word

10   application, the edits would not be saved.  However, to say the user was not modifying the

11   document's contents for those 20 minutes merely because the edits did not save contravenes the

12   plain and ordinary meaning of "modifying a content."

13       Topia nevertheless contends the plain and ordinary meaning of the broader phrase

14   "modifying a content of the first file stored on the first client device" as understood by a person of

15   ordinary skill in the art ("POSITA") is "saving the file to persistent storage on the first client

16   device." (Dkt. No. 169-1 at 1.)  So, the Court must look to "those sources available to the public

17   that show what a person of skill in the art would have understood disputed claim language to

18   mean," including the claim language, the specification, and Topia's expert.  *Phillips*, 415 F.3d at

19   1314.

20       **4.  The intrinsic evidence supports the construction of "modifying a content"**
         **as "editing content of the file, which does not involve saving the file."**

21       As in the Delaware litigation, "the key dispute here is that: (1) [Topia] believes that in

22   order for a user to have accomplished 'modifying' a file, the edits the user makes to the file *must*

23   *also be saved*; but (2) [Box] asserts that 'modifying' a file *is completed when the user edits the*

24   *file*—and that saving the file is a *separate step* that is *not* a part of the modification process."

25   (Dkt. No. 178-2 at 11 (emphasis in original).)  The Court agrees with the Delaware court that

26   "modifying" and "saving" as used in the '561 patent and the other asserted patents are two

27   "separate and distinct activities."  (*Id.* at 13.)

28

United States District Court
Northern District of California

Federal Circuit caselaw teaches that in the absence of evidence to the contrary, "different claim terms are presumed to have different meanings." *See, e.g., Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008). It is also presumed that "the same claim term in the same patent or related patents carries the same construed meaning" absent evidence suggesting otherwise. *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003); *see also In re Katz Interactive Call Processing Pat. Litig.*, 639 F.3d 1303, 1325 (Fed. Cir. 2011) (stating courts "ordinarily interpret claims consistently across patents having the same specification"). These claim construction principles mandate rejection of Topia's proposed construction.

### i. Claims

Claim 1 of the '561 patent is instructive. Claim 1, in relevant part, reads:

> the second application automatically transfers the copy of the **modified first electronic file** to the first electronic device upon determining that **a save operation** has been performed on the **modified first electronic file**.

'561 patent, 11:6-9 (emphasis added). Namely, the system must determine "*a save operation* has been performed *on the modified first electronic file*" prior to transfer of that file. *Id.* (emphasis added). If modifying a file necessarily requires saving the file, then the additional step of "determining that a save operation has been performed on the *modified first electronic file*" would serve no purpose because the modified file must be saved to be considered modified. *See id.* (emphasis added).

Topia's argument to the contrary is not persuasive. Topia asserts in its briefing in this case and its motion for reargument in the Delaware case that saving a file is distinct from the software determining that file has been saved. (Dkt. No. 182-1 at 10-11; Dkt. No. 180 at 8.) Even so, Topia still runs into the same issue. Regardless of whether the system is determining whether a save operation has been performed, saving is still identified as an operation "performed on the modified first electronic file." '561 patent, 11:6-9. But there is no need to perform a save operation or determine a save operation has been performed on a file that, by Topia's definition, has been edited *and saved*. Under Topia's construction, the system could simply determine the

13

file has been "modified" rather than determining an unnecessary save operation has been performed on an already saved file. It is well established that "interpretations that render some portion of the claim language superfluous are disfavored." *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1340 (Fed. Cir. 2016) (quoting *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004)).

### ii. Specification

The specification similarly supports "modifying a content" as not requiring "saving." In the '607 patent's specification "saving the file" is described as a possible trigger event—an event that initiates the transfer of the "modified file." '607 patent, 8:29-41. The specification states:

> In operation, according to an embodiment, the user may open and **modify a file 370**, such as a word-processing document or other electronic file. Alternatively, the user may create a first instance of the file **370**. The user may have previously have associated, or may now associate, the file **370** with the transfer client **310**. Upon a predetermined and user-configurable triggering event, the transfer client **310** transfers **the modified file 370**, or a **copy of the modified file**, to the server **230**. Such a triggering event may include, but be not limited to, **the user saving the file**, the elapsing of a predetermined amount of time during which the file has been opened, or the re-initiation of a communication session between the device **210** and the server **230**.

*Id.* (emphasis added). "[S]aving the file" is thus presented as a separate event that occurs after a user "modifying" a file—after the file is modified, that is, edited, saving the file may trigger transfer of the file. *See id.* This intrinsic evidence supports the conclusion that "modifying" a file does not involve saving the file. Other aspects of the specification confirm this understanding of modifying as being distinct from saving. *See id.* at 3:24-26 ("If the customer, for example, were to open the file, *change it*, then *save it back out*, the results would be ambiguous …") (emphasis added)).

In its motion for reargument in the Delaware case, Topia insists the specification identifying "the user saving the file" as a triggering event is consistent with "modifying" meaning

*editing and saving.* (Dkt. No. 182-1 at 13.) To support its point, Topia presents an alternative reading of the relevant passage from the '607 patent:

> In operation, according to an embodiment, the user may open and ~~modify~~ <u>edit and save</u> a file . . . , such as a word-processing document or other electronic file. Alternatively, the user may create a first instance of the file . . . . Upon a predetermined and user configurable triggering event, the transfer client . . . transfers the ~~modified~~ <u>edited and saved</u> file . . . , or a copy of the ~~modified~~ <u>edited and saved</u> file, to the server . . . . Such a triggering event may include, but be not limited to, the user saving the file, the elapsing of a predetermined amount of time during which the file has been opened, or the re-initiation of a communication session between the device . . . and the server . . .

(*Id.* (quoting '607 patent, 8:29-41 (edited with track changes for demonstrative purposes)).) Topia asserts the triggering event of "the user saving the file" is referring to the saving step included in the modification process, not a separate step. (*Id.*)

But "the user saving the file" is specifically referring to "the modified file." *See* '607 patent, 8:29-41. The surrounding text demonstrates the triggering events are specifically acting on a file that has already been modified. *See id.* For instance, "the elapsing of a predetermined amount of time during which *the file* has been opened" triggers the transfer of "the modified file." *Id.* (emphasis added). If "the file" had *not* been modified during that predetermined amount of time, then there would be no transfer of a "modified file." *See id.* The transfer of a "modified file" would only be triggered if a "modified file" had been open for a predetermined amount of time. *Id.* When considering that "the file" really means "the modified file," "the user saving [*the edited and saved*] file" would be redundant. *See id.*

Topia next argues construing "saving" as distinct from "modifying" contravenes the invention's purpose. It is true that if modifying does not also require the file to be saved, files on separate devices may get out of synch. For instance, editing a file on a first device without saving the file to that first device would nevertheless initiate the transfer of that file to a second device. But, if the user fails to save the file to the first device after editing and subsequently closes the file on the first device, the updated version would not be reflected on the first device. The updated file would, however, be reflected on the second device since it was transferred when the user edited

15

the file.  However, Topia fails to identify any intrinsic evidence showing the claims explicitly exclude this scenario.  And courts "construe the claim as written, not as the patentees wish they had written it."  *In re Kostic*, 135 F.4th 1374, 1379 (Fed. Cir. 2025) (quoting *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004)).  Additionally, while the requirement of constant connection, which would be needed to execute the claimed system, was identified in the specification as a drawback of prior art systems, the specification was specifically referring to file access, not synchronization.  '607 patent, 2:42-47.  "Files stored on a distributed file system are generally inaccessible if the customer's machine is not connected to it."  *Id.* at 2:42-45.  Here, access to a customer's documents is not the problem, and the specification did not discuss any drawback of constant connection to a server system for synchronization purposes.  In fact, even if *saving* the edited file was the triggering event, a user saving their edits via auto-save functionality would require the same constant connectivity that Topia insists is a problem.

Topia also argues the exclusion of "saving" from "modifying" improperly excludes the embodiment in which saving is the triggering event; so, not including saving as part of modifying must be incorrect.  The patent teaches "the user modifying a content" is the triggering event, but in the specification discussed above the user saving the file is listed among other potential triggering events.  If "the user modifying a content" does not include saving, then saving cannot be a triggering event.  While there is a "strong presumption against a claim construction that excludes a disclosed embodiment," *Katz*, 639 F.3d at 1324, "a claim need not cover all embodiments" and "[a] patentee may draft different claims to cover different embodiments." *Intamin Ltd. v. Magnetar Techs., Corp.*, 483 F.3d 1328, 1337 (Fed. Cir. 2007).  "The mere fact that there is an alternative embodiment disclosed in the [asserted patent] that is not encompassed by [our] claim construction does not outweigh the language of the claim, especially when the court's construction is supported by the intrinsic evidence," as is the case here.  *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373 (Fed .Cir. 2008).  And "this is especially true where, as here, other unasserted claims in the parent patent cover the excluded embodiments." *Aug. Tech. Corp. v. Camtek, Ltd.*, 655 F.3d 1278, 1285 (Fed. Cir. 2011).  Here, claim 1 of the '561 patent, the first patent in this patent family, teaches a system in which the file is not transferred until

"determining a save operation has been performed on the modified first electronic file." '561 patent, 11:6-9. This claim would encompass the embodiment in which saving is the triggering event.

### 5. The Court is not persuaded by Topia's expert Dr. Shenoy.

During oral argument, Topia argued for the necessity of construing "modifying a content *of the first file stored on the first client device*" as a whole. (Dkt. No. 190 at 27:2-14); '607 patent, 10:65-67 (emphasis added). In this context, Topia asserts by failing to save the edited content, the content of the "file stored on the first client device" would not be edited. That is, "the file" that the user is modifying is not necessarily the file they are actively editing on their laptop, but it is the file saved in persistent storage on the first client device. The file saved in persistent storage is only modified if the user presses save, in which the edits are then applied to the stored file. Topia does not identify any part of the specification to support this reading; instead, it relies entirely on its expert Dr. Shenoy. In his report, Dr. Shenoy opined "a POSA would understand that to modify a file, the user must open the file from the computer's persistent memory, edit the contents of the file in nonpersistent memory, and then save the file back to persistent memory." (Dkt. No. 177-6 ¶¶ 121-124.) Box's expert Dr. Houh did not opine on this issue as it was raised during briefing.

The Court is not persuaded by Dr. Shenoy. Dr. Shenoy's testimony does not reconcile Topia's interpretation with the intrinsic record, let alone the intrinsic evidence most strongly contradicting his opinion such as claim 1 of the '561 patent. Instead, his opinion is largely based on a dictionary definition of "the file." (Dkt. No. 177-6 ¶ 122 ("A file is a 'uniquely named collection of program instructions or data stored on a hard drive, disk, or other storage medium and treated as a single entity.'") (quoting Excerpts of Microsoft Encarta College Dictionary, 2001 Ed.).) Dr. Shenoy does briefly reference the user saving the file as a triggering event for transferring the modified file, which is unpersuasive for the reasons set forth above, and a mention of files stored on the "hard drives of the user devices" in the specification. (Dkt. No. 177-6 ¶ 124); '607 Patent, 8:18-21; 37-41. The reference to hard drives in the specification does not support Topia's construction. Far from requiring the modified file to be the file stored in

17

1    *persistent* storage on the first client device, the specification teaches storage may include non-

2    persistent storage such as volatile or RAM:

3    > Computer storage media includes **both volatile and nonvolatile**,
4    > removable and non-removable media implemented in any method or
     > technology for storage of information such as computer readable
5    > instructions, data structures, program modules or other data.
     > Computer **storage** media **includes, but is not limited to, RAM**,
6    > ROM, EEPROM, flash memory or other memory technology, CD-
     > ROM, digital versatile disks (DVD) or other optical disk storage,
7    > magnetic cassettes, magnetic tape, magnetic disk storage or other
     > magnetic storage devices, or any other medium which can be used to
8    > store the desired information and which can accessed by computer
9    > **110**.

10   '607 patent, 5:42-54.  "[A] court should discount any expert testimony that is clearly at odds with

11   the claim construction mandated by the claims themselves, the written description, and the

12   prosecution history."  *SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1195, 1210 (Fed. Cir.

13   2013).  Besides its expert, Topia has not identified any other evidence—intrinsic or otherwise—

14   suggesting the file must be saved to persistent storage on the first client device.

15          **6.  Excluding "saving" from the meaning of "modifying a content" does not**
16          **improperly add a negative limitation.**

17          Finally, Topia asserts the exclusion of "saving" from "modifying a content" improperly

18   adds a negative limitation to the claim.  Not so.  The Court is merely interpreting "modifying" to

19   mean editing and, in doing so, rejecting Topia's interpretation that "modifying" means "saving the

20   file to persistent storage on the first client device."  The Court is not excising "saving" from the

21   existing scope of "modifying" because "modifying" never included "saving" in the first place.  In

22   contrast, in the cases Topia cites the claimed terms did "not on their face exclude" certain

23   elements.  *See e.g., Ethicon LLC v. Intuitive Surgical, Inc.*, 847 Fed. App'x 901, 907 (Fed. Cir.

24   2021) ("[T]he rather generic terms 'rotary drive member,' 'rotary member,' and 'rotatable drive

25   member' do not on their face exclude a trigger or a component integral with a trigger.").

26          The claims being "comprising" claims does not change this analysis.  While "comprising"

27   claims give rise to a presumption "that the claim does not exclude additional, unrecited elements,"

28   *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1348 (Fed.

United States District Court
Northern District of California

Cir. 2001), "[t]he presumption raised by the term 'comprising' does not reach into each of the []

steps to render every word and phrase therein open-ended." *Dippin' Dots, Inc. v. Mosey*, 476 F.3d

1337, 1343 (Fed. Cir. 2007).  That is, "an infringing process could practice other steps in addition

to the ones mentioned" but the claimed steps must "all be practiced as recited in the claim."  *Id.*

Lastly, given there is clearly a dispute as to whether "modifying" involves saving, the

Court "not the jury, must resolve that dispute."  *O2 Micro*, 521 F.3d at 1360.  If the Court were

only to interpret "modifying a content" to mean "editing a content" without determining if

"modifying" can include saving, this issue would inevitably end up in front of a jury.  That would

be legal error.  *See Eon*, 815 F.3d at 1319.

***

For these reasons, the Court construes "responsive to the user modifying a content" as

meaning "the user modifying a content, not a timing based or periodic trigger, initiates the

synchronization process."  Further, the Court construes "modifying a content" to mean "editing

content of the file, which does not involve saving the file."

## II.     Term 2

| Claim Term | Box's Proposed Construction | Topia's Proposed Construction |
|---|---|---|
| "automatically transfer" / "automatically transferring" ('607, '787, '823, and '622 patents) | "automatically transfer": push without any request from a client. "automatically transferring": pushing without any request from a client. | No further construction is necessary. This term should be given its plain and ordinary meaning, e.g., the server system or the first computer system is configured to automatically transfer the file or the first metadata to the second client device. In other words, the server system or the first computer system [not the second client device] initiates the transfer. |

The term "automatically transfer" or "automatically transferring" appears in all asserted

patents.  For example, the term appears in claim 1 of the '607 patent as follows:

> a server system comprising one or more processors programmed with
> computer program instructions that, when executed, cause the server
> system to:

United States District Court
Northern District of California

…

> **automatically transfer** the first metadata to the second client device based on the first priority being greater than the second priority such that the first metadata is transferred to the second client device prior to the copy of the first file being transferred to the second client device; and
>
> **automatically transfer**, over a network, the copy of the first file to the second client device associated with the user to replace an older version of the first file stored on the second client device, responsive to (i) resuming communication with the second client device and (ii) receiving the copy of the first file from the first client device.

'607 patent, 10:59-11:25 (emphasis added).  The term is used in substantially the same context in all asserted patents.

The parties' dispute as to the meaning of "automatically transfer" stems from statements made during prior IPR proceedings.  Box argues Topia defined "automatically transferring" during the IPR proceedings to mean "pushing without any request from the client."  (Dkt. No. 174 at 16.)  Topia, in contrast, argues "automatically transferring" means "the server system or the first computer system [not the second client device] initiates the transfer."  (Dkt. No. 169-1 at 2.)  Additionally, Topia asserts Box should be estopped from arguing a different construction in this proceeding than the one presented in the IPRs.  The Court first discusses why Topia's prior statements during IPR proceedings support Box's proposed construction of "automatically transfer" as meaning "push without any request from a client."  Then, the Court addresses why Box is not judicially estopped from proposing this construction.

**A. Topia disclaimed the full scope of "automatically transfer" during the IPR proceedings.**

During the prosecution of a patent, "[a] patentee may, through a clear and unmistakable disavowal in the prosecution history, surrender certain claim scope to which he would otherwise have an exclusive right by virtue of the claim language."  *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1324 (Fed. Cir. 2009).  And, a prosecution disclaimer during the prosecution of one patent can apply to related, later issued patents.  *See Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349-50 (Fed. Cir. 2004); *see also Verizon Servs. Corp. v. Vonage Holdings*

United States District Court
Northern District of California

1    *Corp.*, 503 F.3d 1295, 1306 (Fed. Cir. 2007) ("[A] statement made by the patentee during

2    prosecution history of a patent in the same family as the patent-in-suit can operate as a

3    disclaimer."). The prosecution disclaimer doctrine applies to statements made during IPR

4    proceedings. *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1360 (Fed. Cir. 2017)

5    ("Extending the prosecution disclaimer doctrine to IPR proceedings . . . ensure[s] that claims are

6    not argued one way in order to maintain their patentability and in a different way against accused

7    infringers.").

8         So, the Court looks to Topia's statements during the IPR proceedings to interpret the

9    meaning of "automatically transfer." Throughout prosecution of the asserted patents, Topia made

10   statements to the Patent Office regarding the phrase "automatically transfer" to distinguish the

11   Brown prior art reference (U.S. Patent No. 7,035,847) and the Sigurdsson prior art reference (U.S.

12   Pub. Patent App. 2007/0174246A1). (*See* Dkt. No. 174-6 at 55-56, 67; *see also* Dkt. No. 174-7 at

13   57-58, 67-68; Dkt. No. 174-8 at 55-56, 65-67; Dkt. No. 174-9 at 55-56, 65-67.)

14        First, in distinguishing the '607 patent from Brown, Topia stated Brown did not "teach[] a

15   server system automatically transferring the copy of the first file to the second client device,

16   responsive to receiving the copy of the first file from the first client device." (Dkt. No. 174-6 at

17   62-63.) Instead, "the cited portions as well as the entire disclosure of Brown unambiguously teach

18   the opposite – that is, the file synchronization must be initiated by the client request to the server.

19   Brown's approach therefore cannot satisfy the automatic transfer requirement of the claims of the

20   '607 Patent – i.e., the server transfers the file on its own without a request from a client." (*Id.* at

21   63.) In other words, according to Topia, whereas "the claims of the '607 patent adopt a push-

22   based file transfer from the server to the client, without the need for the client to explicitly request

23   it," Brown involved a "client pull" file transfer where "the user must initiate synchronization."

24   (*Id.*) Topia also made substantially similar statements during prosecution of the '622 patent.

25   (Dkt. No. 174-7 at 63-64.)

26        Topia contends its statements to the Patent Office distinguished prior art references based

27   on the *initiation* of the file transfer, not the entire file transfer. That is, the "automatically transfer"

28   limitation would not read onto a system in which the client must *initiate* the transfer, but it would

United States District Court
Northern District of California

1    cover a system in which a client must make a request, so long as the process has already been

2    initiated prior to this request.  Indeed, Topia made clear that Brown was not an automatic transfer

3    because Brown taught a system in which the user must initiate the file transfer.  But Topia did not

4    explicitly distinguish Brown on the narrow basis that Topia's invention *initiated* file transfer

5    without the user explicitly requesting it.  Instead, Topia only stated "the claims of the '607 patent

6    adopt a push-based file transfer from the server to the client, *without the need for the client to*

7    *explicitly request it*."  (Dkt. No. 174-6 at 63.)  Nevertheless, had these statements existed in

8    isolation, they may well fall short of the requirement for a clear and unmistakable disavowal.

9         But Topia's disclaiming statements did not stop there.  Topia further distinguished both

10   Brown and Sigurdsson from all the asserted patents on the ground both references taught "a HTTP

11   server" which "does not perform functions 'automatically' without client requests."  (*See, e.g.,*

12   Dkt. No. 174-6 at 55, 66.)  "[T]he HTTP protocol is a request-response protocol," also known as

13   "a client-pull architecture."  (Dkt. No. 174-6 at 55, 66.)  In essence, "*clients send HTTP requests*

14   to the server and *the server sends HTTP responses* after processing each request."  (*Id.* (emphasis

15   added).)  Topia told the Patent Office this protocol does not support a "functionality where the

16   server can automatically send data to a client without the client making requests for data."  (*Id.*)

17   Furthermore, Topia asserted it would not have been obvious to replace the pull-based HTTP server

18   of Brown and Sigurdsson with a server that automatically pushes data, such as a file or metadata,

19   to a client "without any client request."  (*Id.* at 55-56, 67; *see also* Dkt. No. 174-7 at 57-58, 67-68

20   (substantially the same content); Dkt. No. 174-8 at 55-56, 65-67 (same); Dkt. No. 174-9 at 55-56,

21   65-67 (same).)  "In fact, a fundamental feature of an HTTP architecture, namely, providing a

22   service in response to a request from a client teaches away from an 'automatic' provision of a

23   service *without any client request*."  (Dkt. No. 174-6 at 67 (emphasis added).)

24        Topia argues these statements should be viewed in the context of what initiates file

25   transfer, not file transfer as a whole.  It is true, both Brown and Sigurdsson required client requests

26   to initiate the file transfer, so Topia arguably could have distinguished them on that narrower

27   ground.  But just because Topia could have more narrowly avoided the prior art does not mean it

28   did.  And "the scope of surrender is not limited to what is absolutely necessary to avoid a prior art

United States District Court
Northern District of California

reference; patentees may surrender more than necessary." *Tech. Props. Ltd. LLC v. Huawei Techs. Co.*, 849 F.3d 1349, 1359 (Fed. Cir. 2017); *see also Traxcell Techs., LLC v. Nokia Sols. & Networks Oy*, 15 F.4th 1136, 1144 (Fed. Cir. 2021) (rejecting the argument against finding a broad disclaimer because a narrower disclaimer would have traversed the prior art, reasoning the patentee is held "to the actual arguments made, not the arguments that could have been made").

The Federal Circuit's reasoning in *TMC Fuel Injection System, LLC v. Ford Motor Company*, 682 F. App'x 895, 898 (Fed. Cir. 2017) is instructive. There, to overcome a prior art rejection, the patentee stated that its invention "eliminates pressure regulators and incremental regulation means of any type from the system," and that "no regulator of any kind is used [] in the system nor needs to be used at anytime." *Id.* at 899 (cleaned up). The patentee nevertheless argued any disclaimer of pressure regulators only applied to a particular type of pressure regulator, a three-port valve, based on a single statement from the prosecution history that referred to a three-port valve. *Id.* The court was not persuaded the disclaimer was so narrow, holding the disavowal to be unambiguous and not directed to any particular type of valve. *Id.*

Same here. Based on the actual arguments made, Topia's statements act as a clear and unmistakable disclaimer of any client request during the transfer process. For one, Topia's statements distinguishing a request-response system from an automatic transfer *without any client request* means just that, *no client requests* at all. While Topia insists the disclaimer should only apply to initiation, its statements during the IPR proceeding were devoid of any language limiting the otherwise broad statements to a narrower context. And Topia repeatedly made these statements during the prosecution of *every* asserted patent. (Dkt. No. 174-6 at 55-56, 67; *see also* Dkt. No. 174-7 at 57-58, 67-68 (substantially the same content); Dkt. No. 174-8 at 55-56, 65-67 (same); Dkt. No. 174-9 at 55-56, 65-67 (same).) Although Topia did not need to disclaim any client request occurring after the initiation, it unambiguously did so.

**B. Judicial estoppel does not prevent Box from presenting a different construction.**

Topia asserts judicial estoppel prohibits Box from asserting an inconsistent claim construction position. During the IPR proceedings regarding the '561 patent, Box proposed that "automatically transfer" means "not transferred 'manually' by a human user from one device to

23

1  another." (Dkt. No. 177-17 at 14.)  This differs from Box's current proposed construction of

2  "automatic transfer" as a "push without any request from a client." (Dkt. No. 169-2 at 1.)  And

3  while litigating in the Western District of Texas, Box did not propose a construction for Term 2

4  beyond its plain and ordinary meaning.  (Dkt. No. 47.)

5          "Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage

6  by asserting one position, and then later seeking an advantage by taking a clearly inconsistent

7  position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001).  Courts

8  consider three factors: (1) whether a party's later position is "clearly inconsistent with its earlier

9  position," (2) "whether the party has succeeded in persuading a court to accept that party's earlier

10  position, so that judicial acceptance of an inconsistent position in a later proceeding would create

11  the perception that either the first or the second court was misled," and (3) "whether the party

12  seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair

13  detriment on the opposing party if not estopped." *New Hampshire v. Maine*, 532 U.S. 742, 750-51

14  (2001) (internal citations omitted).  Here, application of judicial estoppel is inappropriate because

15  Box's current position is not "clearly inconsistent" with its previous position and any

16  inconsistencies would not be unfair.  *See id.*

17          Beginning with the "clearly inconsistent" factor, it is undisputed Box's current

18  construction is different from its prior constructions.  But, the intrinsic record has changed since

19  Box asserted its prior position.  During the IPR proceedings, Topia asserted "automatically

20  transfer[ing]" does not include a pull-based system that requires initiation by a request from a

21  client.  In response to this disclaimer, Box adopted the new construction it proposes in the present

22  claim construction: that "automatically transferring" means "pushing without any request from the

23  client." (Dkt. No. 174 at 16.)  Thus, the addition of Topia's IPR statements to the intrinsic record

24  give rise to "a different dispute concerning the claim terms"—whether Topia limited the scope of

25  its claims during the IPR proceedings, not whether the asserted claims are valid.  *See SanDisk*

26  *Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1291 (Fed. Cir. 2005).

27          This prosecution disclaimer dispute could not be raised in the prior proceedings for two

28  reasons.  First, Topia made its disclaiming statements to the Patent Office in May 2023, after the

United States District Court
Northern District of California

24

*Markman* briefing in the Western District of Texas submitted in 2022 and the IPR petitions filed in January 2023. (Dkt. Nos. 44, 47, 52, 54, 59.) Second, "a disclaimer is not binding on the PTO in the very IPR proceeding in which it is made." *CUPP Computing AS v. Trend Micro Inc.*, 53 F.4th 1376, 1383 (Fed. Cir. 2022). So, neither party could have used the disclaiming statements Topia made during the IPR proceedings to narrow the scope of the claims during that proceeding. However, "a disclaimer in an IPR proceeding is binding in later proceedings, whether before the PTO or in court." *Id.* It is therefore appropriate for Box to address the disclaimer in its proposed construction here.

The unfairness factor also weighs against judicial estoppel. First, Box does not gain an unfair advantage. As discussed above, Box's changing construction reflects a changing intrinsic record, not gamesmanship; it is not unfair for Box to assert a binding disclaimer it was previously unable to address. Second, Topia does not suffer an unfair detriment. "The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent." *Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003). As Box argues, Topia should have expected that if the asserted patents survived, Topia's disclaiming statements would bind Topia in litigation. Thus, the equities do not favor estoppel.

***

Based on Topia's statements during the IPR proceedings, the Court adopts Box's proposed construction of "automatically transfer" and "automatically transferring" to mean "push without any request from the client" and "pushing without any request from the client."

### III.    Term 3

| Claim Term | Box's Proposed Construction | Topia's Proposed Construction |
|---|---|---|
| Graphical availability indication presented "proximate" a file | Indefinite. | The term "proximate" is not indefinite. No further construction is necessary. This term should be given its plain and ordinary meaning, e.g., close to, such that a POSA would associate the graphical availability indication with the graphical file representation or the |

United States District Court
Northern District of California

| representation ('823 patent) | | graphical availability indication with the file icon. |
|---|---|---|

The term "proximate" appears in claims 1, 8, and 13 of the '823 patent. Claim 1, in relevant part, reads:

> wherein, before the copy of the first file is transferred to the second client device:
>
> (i) the transfer of the first metadata to the second client device causes a graphical availability indication of the updated version of the first file to be presented at the second client device based on the first metadata, and
>
> (ii) the graphical availability indication is presented **proximate** a file icon representing the first file on a user interface of the second client device, and
>
> wherein the graphical availability indication indicates that the updated version of the first file generated from the user modifying the content of the first file is available to be downloaded from the server system to the second client device; …

'823 patent, 11:35-49 (emphasis added). The parties dispute whether "proximate" is indefinite. Box argues claims 1, 8, and 13 are indefinite because proximate is a vague term of degree lacking objective boundaries. Topia disagrees, insisting a POSITA would understand the scope of "proximate" based on the claim language and specification. As described below, based on the intrinsic record, the term "proximate" as used in the '823 patent is definite and plainly means "close to, such that a POSITA would associate the graphical availability indication with the graphical file representation or the graphical availability indication with the file icon."

**A. The intrinsic evidence supports a finding of definiteness.**

**1. Claims**

Beginning with the claim language surrounding "proximate," the "claims themselves provide substantial guidance as to the meaning" of the term. *Phillips*, 415 F.3d at 1314. Claim 1 of the '823 patent states "the graphical availability indication is presented *proximate* a file icon representing the first file on a user interface of the second client device." '823 patent, 11:42-44

United States District Court
Northern District of California

1    (emphasis added).  Further, the "graphical availability indication indicates that the updated version

2    of the first file generated from the user modifying the content of the first file is available to be

3    downloaded from the server system to the second client device."  *Id.* at 11:45-49.  The claim

4    language requires the graphical availability indication to be located "proximate" a specific file

5    icon so that the graphical availability indication can signal to the user an updated version of that

6    specific file represented by the file icon is available for download.  *See id.* at 11:42-49.  Thus, a

7    POSITA would reasonably understand "proximate" to require placement of the graphical

8    availability indication close enough to a specific file icon so that a user would associate the

9    graphical availability indication with that file icon.

10        Box argues this understanding of the term "proximate" as being based on a POSITA's

11    spatial association of a graphical availability indication with a file icon merely replaces a

12    subjective term with a POSITA's subjective opinion.  The Court disagrees.  In *Mentor Graphics*

13    *Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1291 (Fed. Cir. 2017), the court found the term "near"

14    sufficiently definite.  The patent at issue taught a method that related HDL code to the analysis

15    results of that specific code and then placed the two pieces of information "near" each other on the

16    display to aid developers when debugging HDL.  *Id.*  To effectively aid developers, the system

17    needed to "display the related HDL and analysis results 'near' enough to each other such that a

18    developer would 'relate' the two."  *Id.*  The patent also provided visual examples consistent with

19    this understanding.  *Id.* at 1292.  The court determined a POSITA would understand "near" as

20    requiring "the HDL code and its corresponding circuit analysis to be displayed in a manner that

21    physically associates the two."  *Id.* at 1291.  Applying the Federal Circuit's reasoning here,

22    "proximate" similarly supplies an objective boundary because the graphical availability indication

23    and file icon would be understood by a POSITA as needing "to be displayed in a manner that

24    physically associates the two."  *See id.*

25                    **2.  Specification**

26        The specification is consistent with the conclusion "proximate" is definite.  The

27    specification states "[a]n indicator signifying a document's availability may be prominently

28    displayed adjacent to the document's representation so that customers are aware of the document's

27

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

availability." '823 patent, 9:32-35.  As in the claim language, the specification caps the distance between the indicator and the document representation to a distance that would still allow a user to recognize the indicator as signaling a specific document's availability.

While Box is correct the specification does not contain extensive description as to the meaning of "proximate," that is not what is required for a term to be definite.  *Niazi Licensing Corporation v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1347-49 (Fed. Cir. 2022), which Box cites, reinforces this point.  The dispute in *Niazi* regarded the terms "pliable" and "resilient."  *Id.* at 1349.  Both were found to be definite based on the claim language and specific examples provided in the specification.  *Id.* at 1349-50.  In laying out the indefiniteness analytical framework, the court reiterated that prior decisions required "guideposts for a skilled artisan to determine the scope of the claims," not mathematical precision.  *Id.* at 1348.  Applying *Niazi*, even absent extensive description as to the meaning of "proximate," the claim language and specification "inform those skilled in the art about the scope of the invention with reasonable certainty.  That is all the law requires."  *See id.* at 1350.

*Power Integrations, Inc. v. ON Semiconductor Corporation*, No. 16-CV-06371-BLF, 2018 WL 5603631, at *19-20 (N.D. Cal. Oct. 26, 2018), is distinguishable.  There the court found the phrase "moderate power level threshold" to be indefinite because the specification provided insufficient guidance as to its scope.  *Id.* at *20.  The specification explained "moderate power level" fell somewhere between "very low" and "maximum."  *Id.*  The specification provided two examples, but "neither provide[d] any standard as to how to calculate the moderate value in a different context," or clarified where "moderate power level" fell in the wide range.  *Id.*  But here, unlike the term at issue in *Power Integrations*, "proximate" does not fall somewhere in a wide range between near and far.  The parties agree "proximate" means near, and the claims and specification further bound the scope of proximate to mean near enough such that a POSITA associates the graphical availability indicator with a specific file icon.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 3. Prosecution History

The prosecution history provides further guidance as to the meaning of "proximate." During prosecution of the '823 patent, Topia provided the Patent Office with a visual representation of a graphical availability indication to facilitate discussion regarding the claims:

| "Second client device" screen at time t0 (graphical availability indication is not presented proximate the file icon) | "Second client device" screen at time t1 (graphical availability indication, e.g., red dot, is presented proximate the file icon) |
|---|---|
| The first file "File1" at the first client device has not yet been modified. | After content of the first file ("File1") on the first client device is modified, and the metadata associated with the updated version of the first file is transferred from the server system to the second client device, but <u>before the copy of the first file (i.e., the updated version) is transferred to the second client device.</u> |
|  |  |

(Dkt. No. 174-10 at 13.)  In this illustration, the graphical availability indication is represented as a dot overlapping with the corner of the corresponding file icon.  (*Id.*)

Box contends this example fails to clarify how far the dot could be presented from the file icon or where the dot could be among several file icons while still being considered "proximate," as depicted by Box's illustration of possible scenarios:



(Dkt. No. 174 at 24.)  In fact, Box's illustration supports the conclusion "proximate" *does* have objective boundaries.  A POSITA would understand with reasonable certainty that a graphical availability indication (in this example, a red dot) that is closer to a different file icon, as in scenario 4, or equidistant between two or more file icons, as in scenario 3, falls outside the scope of "proximate."  (*See* Dkt. No. 174 at 24.)  Even on a display with a single file icon, the requirement that a user be able to associate the graphical availability indication with a specific file icon limits the location of the graphical availability indication to a small radius around, and potentially overlapping with, that file icon.  While it is undisputed the exact distance or location of the graphical indication is left undefined, "mathematical precision is not required" for a term to be sufficiently definite.  *Interval Licensing*, 766 F.3d at 1370.

### 4.  Box's IPR Expert

During IPR proceedings, Box's expert Dr. Balakrishnan understood the scope of "proximate" enough to compare the claims to the prior art.  (Dkt. No. 177-13 ¶¶ 203-204.)

Specifically, Dr. Balakrishnan's expert report stated the claim encompassed "overlays of distinct graphics," an "overlay [of] a graphical availability indicator such that it slightly overlaps with an underlying file icon that is proximate to the graphical availability indicator," and "a graphical availability indication that is proximate (i.e., near) a file icon but not overlapping the file icon." (*Id.* ¶ 204.)

While application by an expert does not, on its own, "establish an objective standard, [it] nevertheless provide[s] evidence that a skilled artisan did understand the scope of this invention with reasonable certainty." *Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1380 (Fed. Cir. 2017); *see also ClearOne, Inc. v. Shure Acquisition Holdings, Inc.*, 35 F.4th 1345, 1350 (Fed. Cir. 2022) (reasoning a defendant's expert's ability to determine that prior art disclosed the claimed supported the conclusion a POSITA did understand the term with reasonable certainty). So here, that Dr. Balakrishnan's stated understanding—used to compare prior art to the claims during the IPR proceedings—is consistent with Topia's proposed meaning of "proximate" supports the conclusion "proximate" is not invalid for indefiniteness.

***

For these reasons, Court finds "proximate" to be definite and plainly meaning "close to, such that a POSITA would associate the graphical availability indication with either the graphical file representation or the file icon."

### IV.    Term 4

| Claim Term | Box's Proposed Construction | Topia's Proposed Construction |
|---|---|---|
| "Priority assignment configuration" ('607, '787, '823, and '622 patents) | Indefinite. | This term is not indefinite. No further construction is necessary. This term should be given its plain and ordinary meaning, e.g., software configured to give greater priority to metadata associated with files than the files. |

The term "priority assignment configuration" appears in the '607, '787, '823, and '622 patents. The term appears in several asserted claims as follows:

United States District Court
Northern District of California

at least one of the server system or the first client device comprises a **priority assignment configuration** to assign greater priority to metadata associated with files than priority assigned to the files such that at least one of the server system or the first client device assigns the first priority to the first metadata and the second priority to the copy of the first file based on the **priority assignment configuration**.

'607 patent, claims 3, 14, 17, and 20; '787 patent, claim 1, 8, and 13; '823 patent, claims 1, 8, and 13; '622 patent, claims 3, 14, and 17 (emphasis added).

The parties disagree about whether the term "priority assignment configuration" is definite based on the intrinsic record. Box asserts the claims and specification fail to sufficiently describe the structure and operation of the "priority assignment configuration." Topia argues a POSITA would understand the "priority assignment configuration" to be software configured to assign greater priority to metadata compared to the file itself. The Court finds the intrinsic record provides sufficient guidance such that "priority assignment configuration" is definite and plainly means "a software configured to assign greater priority to metadata associated with the files than the files."

### A. The intrinsic evidence supports a finding of definiteness.

#### 1. Claims

The claim language surrounding "priority assignment configuration" provides guidance to a POSITA as to the operation of the term. As the term's plain language suggests, a "priority assignment configuration" is a configuration that assigns priority. The claims confirm as much. The claims require that a "priority assignment configuration" exist on "at least one of the server system or the first client device." '823 patent, 11:53-55. The server system or first client device implements the "priority assignment configuration" "to assign greater priority to the metadata associated with files than to the files" such that metadata associated with the first file is assigned "the first priority" and the copy of the first file is assigned "the second priority." *Id.* at 11:54-61. The remaining claim language specifies that the metadata, having been assigned first priority, is transferred prior to the copy of the first file. *Id.* at 11:29-34.

Box argues Topia's proposed meaning of the term would be superfluous. To illustrate its point, Box inserted Topia's proposed construction into the claim language: "a [software configured to give greater priority to metadata associated with files than the files] to assign greater

United States District Court
Northern District of California

priority to metadata associated with files than priority assigned to the files." (Dkt. No. 174 at 28.) But Box's argument misconstrues Topia's interpretation. Topia seeks the plain and ordinary meaning of the term "priority assignment configuration" in the context of the entire phrase in which the disputed term exists. Topia proposes "priority assignment configuration" means software specifically configured to do what is required by the claim language: "to assign greater priority to metadata associated with files than priority assigned to the files." *See* '823 patent, 11:54-56. The added context Topia provides does not render the proposed construction superfluous.

### 2. Specification

The specification further alleviates ambiguity as to the structure of the "priority assignment configuration" and points to it as a software structure. First, the specification discusses the invention in terms of *applications* operating on the server system and first client device. Specifically, the specification discloses a synchronization application operating on the server system and a file transfer application installed on the user device to facilitate transfer of the file from the first client device to the server. *Id.* at 8:15-31; 61-62 (emphasis added). The specification later states, "any device owned or otherwise controlled by the user and running a synch application, such as synch application **380**, as provided in an embodiment of the invention can perform the storage and/or synching functions described elsewhere herein. That is, the user device **280** or user device **210**, rather than the server **230**, may perform such functions." *Id.* at 10:57-63. Whether the "priority assignment configuration" exists on the server system or the first client device, a POSITA would reasonably understand it to be a component of the synch or file-transfer *application*. And a POSITA would reasonably understand an "application" to be software.

Second, the specification consistently discusses the overall invention in the context of software. For instance, the Field of the Invention describes the invention as "relat[ing] generally to *computer-implemented processes* and, more specifically, to sharing of electronic files among computer systems." '823 patent, Field of the Invention (emphasis added). The specification compares the claimed invention to "[o]ther file sending and synchronization software." '823

patent, 10:49-63.  This comparison to "other software" differentiates the invention from prior systems based on its storage system, not its structure, thus implying the invention is also a "file sending and synchronization *software*."  *See id.*  As the overall invention is a software system, a POSITA would reasonably understand a component of this system, here the "priority assignment configuration," to be software.

### 3. Prosecution History

The prosecution histories of the '787 and '823 patents further support a finding of definiteness.  For one, during prosecution of the '787 patent, the claim language, including the disputed term, was given as the specific reason for allowance.  (Dkt. No. 177-12 at 172.)  The examiner naming the "priority assignment configuration" feature as the reason for allowance supports Topia's argument this term is sufficiently clear.  Additionally, during prosecution of the '823 patent, the patent examiner proposed adding "priority assignment configuration" and the surrounding claim language as an amendment in order to allow the claims.  (Dkt. No. 177-11 at 221-31.)  As the Federal Circuit observed in an unpublished opinion, the court "presume[s] that an examiner would not introduce an indefinite term into a claim when he/she chooses to amend the claim for the very purpose of putting the application in a condition for allowance."  *Tinnus Enters., LLC v. Telebrands Corp.*, 733 F. App'x 1011, 1020 (Fed. Cir. 2018).

### B. The extrinsic evidence supports definiteness as well.

Box's current expert Dr. Houh does not tip the scales in favor of indefiniteness.  Dr. Houh merely states the patent fails to explicitly disclose "that the function is performed entirely in software as opposed to being performed at least in part in firmware and/or hardware."  (Dkt. No. 175 ¶ 61.)  Dr. Houh does not clarify how a "priority assignment configuration" could be hardware or firmware.  Dr. Houh's "conclusory, unsupported" assertion is "not useful" to this Court.  *Phillips*, 415 F.3d at 1318.

On the contrary, as with Term 3, Box's IPR expert's understanding of the meaning and scope of "priority assignment configuration" supports a finding of definiteness.  Dr. Balakrishnan understood "priority assignment configuration" with reasonable certainty when comparing the claim language to prior art references.  (Dkt. No. 177-13 ¶¶ 166-180.)  Specifically, Dr.

Balakrishnan understood "priority assignment configuration" to be a "priority algorithm" in the system, "configured on the first client and/or Server [], [that] categorically assigns greater priority to metadata and lower priority to files, thereby causing metadata to transfer prior to the transfer of the associated files based on the greater priority, to advantageously inform clients about updated files." (*Id.* ¶ 176.)  In discussing the obviousness of the "priority assignment configuration" feature, Dr. Balakrishnan stated a POSITA would have background knowledge of the "practice of prioritizing the transfer of metadata before its associated content, and the benefits of doing so," because "well-known commercially available *software* prioritized metadata transfer for similar reasons."  (*Id.* ¶ 186 (emphasis added).)  He asserted Topia's invention would be obvious considering specific "commercially available *software*," such as Microsoft Outlook, included functionality to "download[] headers for email messages—which comprise metadata such as a message's subject, date, sender and recipients—before downloading the messages themselves." (*Id.* ¶¶ 186-87 (emphasis added).)  In contrast, the words "hardware" and "firmware" do not appear anywhere in his report.  Dr. Balakrishnan thus understood "priority assignment configuration" to refer to software.

Box once again argues prior expert testimony is immaterial to claim construction in the present case.  But, as discussed above regarding Term 3, prior expert opinions displaying an understanding of a disputed term's scope, while not dispositive, support a definiteness finding. *See Sonix*, 844 F.3d at 1380.

***

For these reasons, the Court finds "priority assignment configuration" to be definite and plainly meaning "a software configured to assign greater priority to metadata associated with the files than the files."

## CONCLUSION

As to Term 1, the Court construes "responsive to the user modifying a content" as meaning "the user modifying a content, not a timing based or periodic trigger, initiates the synchronization process."  Further, Court construes "modifying a content" to mean "editing content of the file, which does not involve saving the file."

1    As to Term 2, the Court construes "automatically transfer" and "automatically

2    transferring" to mean "push without any request from the client" and "pushing without any request

3    from the client."

4    As to Term 3, the Court finds "proximate" to be definite and plainly meaning "close to,

5    such that a POSITA would associate the graphical availability indication with either the graphical

6    file representation or the file icon."

7    As to Term 4, the Court finds "priority assignment configuration" to be definite and plainly

8    meaning "a software configured to assign greater priority to metadata associated with the files than

9    the files."

10    A further case management conference is scheduled for November 19, 2025 at 2:00 p.m.

11    via Zoom video.  A joint case management conference statement with a proposed schedule

12    through trial is due November 12, 2025.

13    **IT IS SO ORDERED.**

14    Dated: October 7, 2025

15

16

17    JACQUELINE SCOTT CORLEY
      United States District Judge

18

19

20

21

22

23

24

25

26

27

28